FILED
United States Court of Appeals
Tenth Circuit

December 14, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DESIREE HERRERA,

      Plaintiff-Appellant,

v.

CITY OF ALBUQUERQUE;
OFFICER M. L. O'BRIEN, in her
individual capacity; JOHN DOES I
through V, in their individual
capacities,

      Defendants-Appellees.

No. 09-2010

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 2:CIV-07-01128-LAM)**

---

David Meilleur, (Nancy L. Simmons, Law Offices of Nancy L. Simmons, P.C.,
Albuquerque, New Mexico, on the briefs), Albuquerque, New Mexico, for
Plaintiff-Appellant.

Erika E. Anderson of Robles, Rael & Anaya, P.C., Albuquerque, New Mexico, for
Defendants-Appellees Officer M. L. O'Brien and City of Albuquerque.

---

Before **BRISCOE, McKAY,** and **HARTZ**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiff Desiree Herrera appeals from the district court's grant of qualified immunity in favor of defendant Maureen O'Brien, and from the district court's entry of final judgment in favor of defendants on her claims pursuant to 42 U.S.C. § 1983. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I

*Factual background*

On October 5, 2005, Albuquerque police officer Maureen O'Brien responded to a call of domestic violence at Herrera's apartment. When O'Brien arrived at the apartment, she encountered Herrera, who at the time was sixteen years old. Herrera stated that she and her boyfriend, Tomas Jaramillo, had been arguing and that Jaramillo struck her. Herrera further stated that Jaramillo left the apartment after the incident, leaving her and her then-three-year-old son, who was asleep in the bedroom, as the only occupants. Herrera also admitted that she had been drinking alcohol.

O'Brien walked through the apartment and observed that it was "filthy," with "razors, food, cigarette butts, and clothes on the floor." App. at 46. O'Brien noticed that "the bathtub was full of black water and had a foul odor." Id. O'Brien also observed "a vicious pit bull chained up in the backyard that had access into the kitchen" of the apartment. Id. at 58. When O'Brien commented on the condition of the apartment, Herrera "responded by stating that she was in the process of moving out." Id. at 31. When O'Brien questioned Herrera about

2

the "state of the tub," Herrera "informed [O'Brien] that the tub had been backing up and that they had spoken to the landlord about the situation." Id. at 32. Herrera also claimed to have "been using someone else's bathroom to bathe her child."[1] Id.

O'Brien decided, based upon the unsanitary conditions of the apartment, to contact New Mexico's Child, Youth & Families Department (CYFD). A CYFD worker arrived on the scene and paramedic services were contacted in order to check the health of Herrera's son. The paramedic examination indicated that the child was in good health. O'Brien also contacted the City of Albuquerque's nuisance abatement officials based on her concerns that the apartment complex was not up to city code.

Ultimately, O'Brien arrested Herrera for violating New Mexico's child abuse statute, N. M. Stat. § 30-6-1. O'Brien did so because she was concerned that Herrera's son "could hurt himself by picking up the razor blades that were on the floor, ingesting the cigarette butts on the floor, being attacked by the pitbull in the kitchen or drowning in the sewage that was in the bathtub." Id. at 153. O'Brien was also concerned "that the child could have sustained an infection due

---

[1] At her deposition, Herrera conceded that her son had been in the bathroom on the day of the domestic violence call and had dropped a diaper into the bathtub. Id. at 156. Herrera also conceded at her deposition that her son had a scratch from playing with the pit bull. Id. at 157. There is no indication in the record, however, that O'Brien was aware of these facts at the time she arrested Herrera.

3

to the sewage in the bathtub." Id. at 154. Lastly, O'Brien "had concerns because . . . Herrera had disclosed . . . that she had been drinking alcohol . . . that evening." Id.

Herrera spent one day in jail as a result of the arrest. Apparently, the criminal charges against her were dismissed.

*Procedural background*

In 2007, Herrera filed suit in New Mexico state court against the Albuquerque Police Department (APD), the City of Albuquerque (City), O'Brien, and John Does I through V, whom she alleged "were involved in hiring, training, supervising or disciplining" O'Brien. Id. at 15. Herrera's complaint summarized the events leading to her arrest on October 5, 2005, and asserted causes of action under the New Mexico Tort Claims Act (Count I) and 42 U.S.C. § 1983 (Counts II and III). Herrera's § 1983 claims were based on her assertion that O'Brien violated her Fourth Amendment rights by arresting her without probable cause.

On November 8, 2007, defendants removed the case to federal district court, noting that Herrera's "right to bring an action for the alleged violation of h[er] constitutional rights was created by federal law, specifically 42 U.S.C. § 1983," and that the federal district court thus "ha[d] federal question jurisdiction" over the action. Id. at 13. Shortly after the removal, Herrera voluntarily dismissed her claims against APD.

On August 21, 2008, Herrera filed a motion for summary judgment on the

4

issue of defendant O'Brien's individual liability on her § 1983 and tort claims. In that motion, Herrera argued "that her arrest was not supported by probable cause . . . ." Id. at 33. The City and O'Brien filed a response in opposition to Herrera's motion, arguing that the question of whether O'Brien had probable cause to arrest Herrera involved genuine issues of material fact and could not be resolved as a matter of law.

On November 24, 2008, the district court issued an order granting Herrera's motion for summary judgment on the issue of defendant O'Brien's individual liability. In that order, the district court first concluded that Herrera had "met her initial burden of establishing that no genuine issue exist[ed] as to any material fact, and that Defendants ha[d] failed to set forth specific facts showing that there [wa]s a genuine issue for trial." Id. at 89. In turn, the district court concluded "that a reasonable officer with the same facts before him or her [as O'Brien] would not have arrested [Herrera] without a warrant." Id. at 95. In other words, the district court concluded, as a matter of law, "that . . . O'Brien arrested [Herrera] without probable cause." Id. at 96. Accordingly, the district court concluded that "O'Brien [wa]s liable under the New Mexico Tort Claims Act and 42 U.S.C. § 1983 for arresting [Herrera] under N.M.S.A. § 30-6-1 without probable cause." Id. at 97.

On December 1, 2008, the City and O'Brien filed a motion for reconsideration of the district court's order granting summary judgment in favor

5

of Herrera on the issue of O'Brien's individual liability. The City and O'Brien asserted that they "[we]re not taking issue with the Court's reasoning, but [we]re asking that, as a matter of law, the Court find that . . . O'Brien [wa]s entitled to qualified immunity and [thus was] immune from suit." Id. at 120. Although defendants conceded "the issue of qualified immunity was not raised in [their] Response to [Herrera's] Motion for Summary Judgment," they noted "it was raised as an affirmative defense in [their] Answer to the Complaint as well as in the Pretrial Order," and, under Tenth Circuit law, could be raised at any time. Id. at 121. As for the merits of the qualified immunity issue, defendants argued that the district court "ha[ving] determined that there was a constitutional violation based upon the facts presented to the Court," "must now consider whether . . . O'Brien's conduct violated clearly established law." Id. at 122. On that issue, defendants argued, the district court expressly noted in its order granting summary judgment for Herrera "that whether . . . O'Brien had probable cause to arrest [Herrera] was a 'close case,'" and "[b]ecause th[e] case [wa]s a 'close case' it would not have been clear to a reasonable officer what the law required." Id.

In her response to defendants' motion for reconsideration, Herrera argued, in pertinent part, that

> because the existence of probable cause [wa]s the determinative
> factor in both an unlawful arrest analysis as well as a qualified
> immunity analysis, and . . . because th[e] Court ha[d] already
> thoroughly examined the probable cause issue and found probable
> cause to be lacking such that a reasonable officer would realize that

6

the effectuation of an arrest under the circumstances would be unlawful and in violation of both federal and state law, . . . there [wa]s no further analysis that need[ed] to be performed by th[e] Court.

Id. at 139.[2]

On December 19, 2008, the district court issued a memorandum opinion and order granting in part and denying in part defendants' motion for reconsideration. The district court denied the motion to the extent defendants were seeking reconsideration of the court's order under Fed. R. Civ. P. 59(e) because, in the court's view, defendants were "clearly attempting to use Rule 59(e) to raise legal arguments that they could have and should have raised prior to judgment." App. at 179 (internal quotation marks and brackets omitted). The district court granted the motion, however, to the extent it sought a determination that O'Brien was entitled to qualified immunity and was thus immune from liability. Focusing on whether the constitutional right at issue was clearly established at the time of Herrera's arrest, the district court concluded that the case law "interpreting New Mexico's child abuse statute," N.M. Stat. § 30-6-1, was not clearly established at the time of Herrera's arrest, and that, in turn, an officer could have, based upon the circumstances encountered at Herrera's apartment, reasonably but mistakenly concluded that Herrera had violated the

---

[2] Shortly after filing her response, Herrera voluntarily dismissed her § 1983 claim against the City, her claims for punitive damages against O'Brien, and all claims asserted against John Does I through V. App. at 124.

child abuse statute by placing her son "in a zone of danger." Id. at 182. In other words, the district court concluded that "[a]n officer's mistaken belief that he or she could arrest on these undisputed facts [wa]s not objectively unreasonable given that [the] New Mexico courts ha[d] continued to clarify what constitute[d] a crime under N.M.S.A. § 30-6-1 since the time of [Herrera's] arrest." Id. The district court in turn concluded that O'Brien was "entitled to qualified immunity." Id. at 186. Lastly, the district court concluded that, "[b]ecause there [we]re no federal claims remaining after finding qualified immunity for . . . O'Brien," "the best course of action would be to decline to exercise its supplemental jurisdiction and allow the New Mexico state courts to decide the issues of state law that remain[ed]." Id. at 187.

On December 19, 2008, the district court entered final judgment against Herrera "on all federal claims" and remanded "all state claims" to New Mexico state court "for further proceedings . . . ." Id. at 189.

II

Herrera raises two issues on appeal. First, she argues that the district court "erred in granting qualified immunity to" O'Brien. Aplt. Br. at 1. In support of this argument, Herrera asserts that "New Mexico's criminal law with respect to the crime that [she] was arrested for is, and was, clearly established such that a reasonable officer would have been on notice of what would constitute probable cause for an arrest under the circumstances" presented here. Id. Second, Herrera

8

argues that, "irrespective of whether qualified immunity shields [O'Brien] from a suit seeking damages," id. at 2, she is entitled to a resolution of her requests for equitable relief, which included "both a declaratory judgment that her arrest and subsequent detention was unlawful, and injunctive relief in the form of expungement of her arrest record with respect to the incident" in question. Id. at 1. We conclude, for the reasons outlined below, that both of these issues lack merit.

*Qualified immunity*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (internal quotation marks omitted); see Hunter v. Bryant, 502 U.S. 224, 229 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or

9

those who knowingly violate the law." (internal quotation marks omitted)).

Resolution of a dispositive motion based on qualified immunity involves a two-pronged inquiry. "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Pearson, 129 S. Ct. at 815-16 (internal citations omitted). "Second, . . . the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Id. at 816. "With regard to this second [prong], the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented." Fogarty v. Gallegos, 523 F.3d 1147, 1155 (10th Cir. 2008) (internal quotation marks and brackets omitted). A reviewing court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S. Ct. at 818. "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry. Id. at 816. We review de novo a district court's qualified immunity ruling. Weigel v. Broad, 544 F.3d 1143, 1150 (10th Cir. 2008).

Here, Herrera alleged that O'Brien violated her Fourth Amendment rights by arresting her, without probable cause, for violating N.M. Stat. Ann. § 30-6-1. In considering O'Brien's qualified immunity defense, the district court resolved the first prong of the qualified immunity inquiry in favor of Herrera by

10

concluding, based upon the uncontroverted facts leading up to Herrera's arrest, combined with the New Mexico case law existing at the time of its decision, that O'Brien lacked probable cause to arrest Herrera for violating § 30-6-1. The district court, however, resolved the second prong of the inquiry in favor of O'Brien, concluding that, based upon New Mexico law existing at the time of the arrest, an officer in O'Brien's position could have reasonably (but mistakenly) concluded that probable cause existed to arrest Herrera for violating § 30-6-1. Herrera challenges this second determination. More specifically, Herrera asserts that the district court's conclusion on the first prong of the inquiry should have been controlling as to the second prong of the inquiry.

Herrera is mistaken on this point. "One purpose of qualified immunity is that we do not force public officials to guess how the law will have developed by the time their actions are scrutinized in federal court." Swanson v. Town of Mountain View, 577 F.3d 1196, 1200 (10th Cir. 2009). "Instead, we look to the relevant precedents at the time of the challenged actions and the obviousness of the violation in light of them." Id. Thus, even though it may now be clear that probable cause was lacking for Herrera's arrest (as the district court determined in assessing the first prong of the qualified immunity inquiry), the critical question under the second prong of the qualified immunity inquiry is whether, at the time of the arrest, O'Brien could have reasonably concluded that probable cause existed for the arrest. See Anderson v. Creighton, 483 U.S. 635, 641 (1987)

11

(holding that, under the doctrine of qualified immunity, "law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials . . . should not be held personally liable."). Necessarily, resolution of this second prong inquiry is governed by "cases published before" Herrera's arrest. Swanson, 577 F.3d at 1200. We may "also examine cases published after the [arrest] to the extent they shed light on the fact that the law was not clearly established at the relevant time." Id.

From a general standpoint, it was clearly established, at the time of Herrera's arrest, that "a government official must have probable cause to arrest an individual." Fogarty, 523 F.3d at 1158-59 (internal quotation marks omitted). Further, it was clearly established at the time of Herrera's arrest that "[t]he principal components of a determination of . . . probable cause" include "the events which occurred leading up to the" arrest, "and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." Ornelas v. United States, 517 U.S. 690, 696 (1996). It was also clearly established that "[t]he first part of th[is] analysis involves only a determination of historical facts, but the second is a mixed question of law and fact . . . ." Id. In other words, the second part of the analysis hinges on "'whether the [applicable] rule of [criminal] law as applied to the established facts [wa]s or [wa]s not violated.'" Id. at 697 (quoting Pullman-

12

Standard v. Swint, 456 U.S. 273, 289, n.19 (1982)).

Because the historical facts leading up to Herrera's arrest are uncontroverted, the focus of the second prong of the qualified immunity analysis in this case hinges on the state of applicable New Mexico criminal law at the time of Herrera's arrest. As noted, O'Brien arrested Herrera for violating N.M. Stat. Ann. § 30-6-1. That statute, entitled "Abandonment or abuse of a child," provides, in pertinent part:

> A. As used in this section:
>
>> (1) "child" means a person who is less than eighteen years of age;
>>
>> (2) "neglect" means that a child is without proper parental care and control of subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parents, guardian or custodian or their neglect or refusal, when able to do so, to provide them; and
>>
>> (3) "negligently" refers to criminal negligence and means that a person knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child.
>
> * * *
>
> D. Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be:
>
>> (1) placed in a situation that may endanger the child's life or health;
>>
>> (2) tortured, cruelly confined or cruelly punished; or

13

(3) exposed to the inclemency of the weather.

E. A person who commits abuse of a child that does not result in the child's death or great bodily harm is, for a first offense, guilty of a third degree felony and for second and subsequent offenses is guilty of a second degree felony. If the abuse results in great bodily harm to the child, the person is guilty of a first degree felony.

N.M. Stat. Ann. § 30-6-1 (emphasis added). Although O'Brien's police report detailing Herrera's arrest did not specify the particular subsection of § 30-6-1 that she believed had been violated, O'Brien now asserts, and the record on appeal confirms, that she believed that Herrera had violated subsection (D)(1) of the statute by knowingly, intentionally or negligently, and without justifiable cause, causing or permitting her son to be placed in a situation that might endanger his life or health.

Significantly, at the time of Herrera's arrest, there was ambiguity in New Mexico case law regarding how much risk a child had to be exposed to in order to result in a violation of § 30-6-1(D)(1). The crime alleged in § 30-6-1(D)(1) has generally been classified by the New Mexico courts as "[c]hild abuse by endangerment," a "special classification designed to address situations where an accused's conduct exposes a child to a significant *risk* of harm, 'even though the child does not suffer a physical injury.'" State v. Chavez, 211 P.3d 891, 896 (N.M. 2009) (italics in original; quoting State v. Ungarten, 856 P.2d 569, 571 (N.M. Ct. App. 1993)). Between 1993 and 2009, the New Mexico courts "interpreted the phrase '*may* endanger,'" as used in § 30-6-1, "to require a

14

'reasonable probability or possibility that the child will be endangered.'" Id. (italics in original; quoting Ungarten, 856 P.2d at 571). "In application, however, this standard . . . created uncertainty in child endangerment cases because 'probability' and 'possibility' connote two different levels of risk." Id. "'Probability' conveys a certain likelihood that a result will occur, whereas 'possibility' means that something is merely capable of occurring." Id. "As an unintended consequence," the New Mexico courts' "use of both terms to define endangerment . . . left unclear the amount or degree of risk necessary to support a conviction." Id.

To rectify this problem, the New Mexico Supreme Court (NMSC), in June of 2009, "t[ook] th[e] opportunity to examine whether [it] should employ a more precise terminology in describing the degree of risk to which a child must be exposed before it can constitute criminal child endangerment." Id. In doing so, the NMSC first concluded that, out of "concerns for adequate notice and fairness to the accused," "the relevant conduct must create more than a 'possibility' of harm before it may be punished as a felony" under § 30-1-6(D)(1). Id. In turn, the NMSC concluded that "a standard that requires proof of a strict probability under all circumstances poses too rigid a bar in its application." Id. at 897. Accordingly, the NMSC "look[ed] to the Uniform Jury Instruction on child endangerment for guidance on the endangerment standard," and held that the appropriate standard was whether the "defendant's conduct created a substantial

15

and foreseeable risk of harm." Id. (internal quotation marks omitted).

After "clarif[ying] the appropriate endangerment standard," the NMSC proceeded to address "the sufficiency of the evidence necessary to prove a criminal violation" of § 30-6-1(D)(1). Id. at 898. In doing so, the NMSC noted that it had never before addressed the question of "whether a filthy home environment [wa]s sufficient on its own to support a felony endangerment conviction." Id. at 899. Instead, the NMSC noted, its prior cases had involved combinations of filthy home conditions and criminal conduct on the part of the defendant (e.g., allowing the minor child to ingest alcohol; allowing the minor child to look at adult pornographic websites). Id. The NMSC ultimately concluded "that particularly egregious living conditions c[ould] conceivably fall within the ambit of criminal child endangerment." Id. The court emphasized, however, that when filthy living conditions provide the exclusive basis for charging a defendant with child endangerment, the State must establish that there was a substantial and foreseeable risk that those filthy living conditions endangered the child. Id. at 900.

Chavez thus establishes that, at the time of Herrera's arrest in October of 2005, an officer in O'Brien's position could reasonably have concluded that it was sufficient to give rise to a violation of § 30-6-1(D)(1) if the conditions found in Herrera's apartment created the mere "possibility" of harm occurring to Herrera's son. In turn, an officer in O'Brien's position could have reasonably

16

concluded that several of the conditions found to exist in the apartment actually created such a possibility. Specifically, an officer could have reasonably concluded that: (1) the razor blades found on the floor created the possibility of the child cutting himself; (2) the standing waste found in the bathtub created the possibility of the child sustaining an infection or, worse yet, drowning; (3) the cigarette butts on the floor posed a possible risk of the child picking them up and ingesting them; and (4) the pitbull in the yard, which had access to the kitchen, posed a possible risk of harm to the child. A reasonable officer in O'Brien's position could also have taken into account Herrera's illegal act, as a minor, of ingesting alcohol, and could have concluded that this act, at a minimum, heightened the possibility of the child being harmed from one or more of the other factors outlined above.

Because an officer in O'Brien's position could have reasonably concluded that probable cause existed to arrest Herrera for violating N.M. Stat. Ann. § 30-6-1(D)(1), the district court properly held that O'Brien was entitled to qualified immunity from Herrera's § 1983 claims.

### *Equitable relief*

In her second issue on appeal, Herrera contends that the district court erred in dismissing her action without addressing her claims for equitable relief. In support of this contention, Herrera asserts that she "requested both a declaratory judgment that her arrest and subsequent detention was unlawful, and injunctive

17

relief in the form of expungement of her arrest record with respect to the incident complained of." Aplt. Br. at 1-2. In turn, Herrera asserts she "is entitled to a resolution of those claims, irrespective of whether qualified immunity shields [O'Brien] from a suit seeking damages." Id. at 2.

In order to determine whether this issue was properly preserved and, in turn, what standard of review we should apply to this issue, we begin by outlining the procedural history of the issue in the district court. Herrera correctly notes that her first amended complaint included a request "for a declaratory judgment that [her] arrest was without probable cause and for injunctive relief expunging all record of her arrest . . . ." App. at 18. According to the record, however, Herrera made no further mention of her request for declaratory relief. At the pretrial conference on November 26, 2008, Herrera's counsel advised the district court that Herrera's "request for expungement of [her] arrest record [wa]s . . . still at issue," but was silent with respect to the possibility of declaratory relief. Id. at 99. The district court's pretrial order, issued immediately after the pretrial conference, in turn made no mention of the original request for declaratory relief. Lastly, Herrera made no mention of the possibility of declaratory relief in any of her dispositive pleadings.

In light of this procedural history, we conclude that Herrera abandoned her request for declaratory relief during the course of the district court proceedings. Therefore, we need not address her arguments to the extent they concern

18

declaratory relief. See generally North Am. Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc., 579 F.3d 1106, 1112 n.5 (10th Cir. 2009) (declining to address argument not raised below).

As for Herrera's request for injunctive relief, the district court asked the parties during the pretrial conference whether it "ha[d] authority to expunge a juvenile's arrest record in state court, especially if the record ha[d] been entered in the NCIC database?" App. at 99. Defense counsel argued, in response to the district court's question, that "[e]xpungement [wa]s governed by state law and there [wa]s a high standard." Id. Defense counsel further argued that "[u]sually, requests such as these are handled by agreeing to seal the record if the juvenile does not have any arrests for two years." Id. Ultimately, "[t]he parties agreed to attempt to resolve this issue by stipulation as to a motion to seal [Herrera's] juvenile arrest record, and [to] notify the [district court] of the status of this issue by Wednesday, December 10, 2008." Id. (emphasis in original).

On December 1, 2008, defendants moved for reconsideration of the district court's order granting summary judgment in favor of Herrera on the issue of O'Brien's individual liability (which, as noted, the district court construed as both a motion for reconsideration and a motion for qualified immunity). On December 4, 2008, Herrera voluntarily dismissed her § 1983 claims against the City and the John Does listed in her first amended complaint. On December 5, 2008, Herrera filed a response to the defendants' motion for reconsideration. According to the

19

record, however, no further pleadings were filed by either side regarding the issue of expungement of Herrera's arrest records. On December 19, 2008, the district court granted in part and denied in part defendants' motion for reconsideration. The district court then, on that same date, entered final judgment in favor of defendants and remanded the case and all remaining state law claims to state district court. Herrera did not file a motion for reconsideration or any other type of pleading asking the district court to rule on her request for expungement of her arrest records. Instead, she simply filed a notice of appeal.

Given this procedural history, we conclude that Herrera "did not preserve th[e] issue for appeal." Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co., 497 F.3d 1135, 1142 (10th Cir. 2007). From the district court's perspective, it was informed by the parties at the time of the November 26, 2008 pretrial conference that they would attempt to resolve the issue "by stipulation as to a motion to seal [Herrera's] juvenile arrest record." App. at 99. At no point after that time did either side file a pleading addressing the expungement issue. Most notably, Herrera did not mention the request for expungement either in her response to the defendants' motion for reconsideration, or by filing her own motion for relief from judgment after the district court granted O'Brien's motion for qualified immunity and entered final judgment. In short, Herrera never presented to the district court the arguments she now asserts on appeal.

Defendants, in their appellate response brief, mention the plain error

standard, but argue that Herrera cannot satisfy it. Aplee. Br. at 18. Notably, Herrera makes no mention of the plain error standard, either in her opening appellate brief or in her appellate reply brief. For that reason alone, we conclude she has failed to carry the "nearly insurmountable burden," Quigley v. Rosenthal, 327 F.3d 1044, 1063 (10th Cir. 2003) (internal quotation marks omitted), that the plain error standard imposes.

Even were we to overlook Herrera's failure to address the plain error standard in her appellate pleadings, it is clear that she cannot satisfy that standard. "To show plain error," Herrera "would have to show (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Duffield v. Jackson, 545 F.3d 1234, 1238 (10th Cir. 2008) (internal quotation marks omitted). In light of Herrera's own failure to properly raise the expungement issue before or after the entry of final judgment, the district court did not err in dismissing her § 1983 claims without addressing whether or not she was entitled to expungement of her arrest record. Indeed, the district court had every right to assume that the parties had effectively resolved the expungement issue by agreeing to seal Herrera's juvenile arrest record. Further, given Herrera's voluntary dismissal of her § 1983 claims against both the City and the APD, the district court could reasonably have concluded that the request for injunctive relief in connection with Herrera's § 1983 claims had been rendered moot, as the only remaining

21

defendant, O'Brien, could not provide the remedy sought. Moreover, it is doubtful that Herrera could establish that any error on the part of the district court affected her substantial rights. Pursuant to the district court's final judgment, Herrera's remaining state law claims were returned to state district court, where she could presumably seek, if necessary, to have her arrest record sealed or expunged. And, for that same reason, any error on the part of the district court did not result in a miscarriage of justice that seriously affected the fairness, integrity or public reputation of judicial proceedings.

AFFIRMED.