FILED
United States Court of Appeals
Tenth Circuit

March 10, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT GERALD HARRIS,

      Plaintiff - Appellant,

v.

REGGIE FORD; RON HARRIS;
NEAL TIERNEY; and MELVIN
DALE,

      Defendants - Appellees.

No. 09-3272

(D. Kansas)

(D.C. No. 5:07-CV-03079-MLB)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

of this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is

therefore ordered submitted without oral argument.

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Plaintiff and appellant Robert Gerald Harris appeals the grant of summary judgment to defendants in this 42 U.S.C. § 1983 action[1] arising out of two searches of Mr. Harris's home.  For the following reasons, we affirm.

**BACKGROUND**

Mr. Harris resided at 203 Russell Street in Scott City, Kansas, at the time of the events relevant to this case.  On October 5, 2005, Scott City emergency dispatch was told that Mr. Harris was at 801 West 4th Street, with an apparently self-inflicted gunshot wound in his hand.  Scott City police officer Reggie Ford went to the 4th Street location, and was immediately told by Deputy Milton Masters, who was already at the scene and who was with Mr. Harris, to go to Mr. Harris's residence on Russell Street and look for a spent shotgun shell "in two old cars."  Ford Dep. at 32, 87; R. Vol. 3 at 135, 141. Officer Ford arrived at Mr. Harris's residence and searched the vehicles but did not find a shotgun shell. Officer Ford observed blood on a lawn chair near the front porch, as well as on the porch itself and on the front door.  The officer entered the residence to look for injured persons.

While looking for anyone injured, Officer Ford saw the following items: .22 caliber shells, ladyfinger firecrackers with no fuses, some pipe, some pieces

---

[1]As explained more fully, _infra_, Mr. Harris's action against one of the defendants is a _Bivens_ action.  See _Bivens v. Six Unknown Agents of Federal Bureau of Narcotics_, 403 U.S. 388 (1971).

of guns, a pair of hemostats, a clock, some wristwatches, and some small hand tools. Believing that these items were being used to construct a bomb, the officer returned to his vehicle and retrieved his camera. Officer Ford reentered Mr. Harris's residence and stayed there for approximately an hour. The officer seized items and took photographs. Throughout this time period, Officer Ford did not have a search warrant or consent to search from Mr. Harris. Additional officers arrived at the scene to assist Officer Ford.

In the evening of October 5, the officers contacted defendant Neal Tierney, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, because of the officers' concern that Mr. Harris might actually have been injured by a pipe bomb explosion. Agent Tierney ordered a criminal background check on Mr. Harris, which revealed his status as a felon. Ronald Harris[2] and Melvin Dale, investigators for the Kansas State Fire Marshal, were also contacted.

On October 6, Agent Tierney and Investigator Harris interviewed Mr. Harris at the hospital where he awaited surgery. During this interview, Agent Tierney asked Mr. Harris what had happened, and Mr. Harris described how a device inside a box "went off," resulting in the injury to his hand. Mr. Harris further stated that someone had planted the device in the box and that this person was out to "get" him. Mr. Harris admitted to having ammunition in his home and

---

[2]Because the plaintiff, Mr. Harris, and investigator Ronald Harris share the same last name, we continue to refer to the plaintiff as Mr. Harris, and the investigator as Harris or Investigator Harris.

he further admitted that he had set up several booby-traps for unwelcome visitors. Mr. Harris indicated that he was concerned about items that were removed from his residence on October 5, because he had been informed that Officer Ford had removed five bags from his residence, and Mr. Harris wanted Agent Tierney to determine what had been removed. Agent Tierney then asked Mr. Harris for consent to search his residence, and Mr. Harris signed a written consent to search his residence, the vehicles on site, and the out buildings. When Investigator Harris asked Mr. Harris if his injury was painful, Mr. Harris responded that "it wasn't all that painful." The investigator also indicated in his report that Mr. Harris was attached to an IV machine to administer pain medication.

Later that day (October 6), Agent Tierney, Harris, Dale and others entered Mr. Harris's residence to conduct a second search. Inside Mr. Harris's home, they noted on the coffee table "a mix of items including 22 cal ammunition and 12 gauge shotgun shells." Report at 2; R. Vol. 1 at 136. The following items were listed on the "receipt for property" seized on October 6: eighteen .22 live federal ammunition, three 12-gauge ammunition, a rifle, pieces of pipe and nails, and drug paraphernalia.

Mr. Harris was subsequently charged with one count of being a felon in possession of ammunition. The government then filed a superseding indictment, charging Mr. Harris with being a felon in possession of ammunition, a gun and methamphetamine. Mr. Harris filed a motion to suppress the evidence seized

-4-

from his residence.  Ultimately, the government moved to dismiss the counts, and the court granted the government's motion without prejudice.  The government has not re-filed charges against Mr. Harris, and the record is silent as to the reasons for the dismissal and failure to re-file.

On December 9, 2005, Mr. Harris filed a *pro se* civil action against the Scott County Sheriff's Office, alleging that his constitutional rights were violated by the seizure of "personal valuable possessions that have absolutely no bearing on the case brought against the plaintiff by the government."  Civil Action at 1; R. Vol. 2 at 148.  Mr. Harris further asserted that certain personal items were taken and he sought the return of those items (three watches, an address book and wedding rings).  On May 15, 2006, Mr. Harris executed a release of all claims. He was given $3,000 in exchange for releasing "Scott County, Scott City, their agents . . . and all other persons . . . from any and all claims . . . from an incident which occurred on or about the 9th day of December, 2005, in Scott County, Kansas."  Release at 1; R. Vol. 2 at 152.[3]  On that same date, a magistrate judge dismissed the case with prejudice.

---

[3]The parties agree that the date stated in the document, December 9, 2005, is erroneous and should be October 5 and 6, 2005.  Additionally, no party argues that that civil action should have any *res judicata* or other preclusive effect on this case.  We decline to consider an issue not raised by the parties.

On March 28, 2007, Mr. Harris, proceeding again *pro se*, filed this § 1983 action[4] against defendants Officer Ford, Special Agent Tierney and Investigators Dale and Harris, asserting that his constitutional rights were violated by the defendants' actions in searching his home on October 5 and 6, 2005. Mr. Harris further alleged that Officer Ford conspired with Agent Tierney and Investigators Harris and Dale to violate his rights by placing evidence seized on October 5 back in his home so that it could be seized the next day after he had given his consent. The district court appointed counsel after the defendants moved for summary judgment on various grounds, including qualified immunity and consent.

The district court granted summary judgment to the defendants, finding they were entitled to qualified immunity for their actions in the searches on both October 5 and 6, 2005, and that Mr. Harris had consented to the October 6 search. With respect to the October 5 search, the court held:

> Since there is no Tenth Circuit or Supreme Court decision on point or a clearly established weight of authority from other courts, the court finds that the right to be free from a seizure of property after an officer has lawfully observed an item in plain view but left the location for a short period before the seizure has not been clearly established.

---

[4]Because Agent Tierney is a federal officer, Mr. Harris's action against him is brought pursuant to Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), while his action against the other defendants is under 42 U.S.C. § 1983. The qualified immunity and consent analysis is the same for both actions. See DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 844 F.2d 714, 720 n.6 (1988).

Memorandum & Order at 16; R. Vol. 3 at 251. The district court held that the October 6 search was consensual. This appeal followed.

On appeal, Mr. Harris argues the district court erred because it (1) failed to find that the defendants were not protected by qualified immunity; (2) applied the plain view doctrine; (3) failed to find that Officer Ford violated the Fourth Amendment by entering Mr. Harris's home without justification and then re-entering the home for the sole purpose of gathering evidence; and (4) failed to find that the defendants' October 6 search violated the Fourth Amendment because it was tainted by evidence acquired in the illegal search the day before and because Mr. Harris's consent was not voluntarily given.

## DISCUSSION

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir.), cert. denied, 130 S. Ct. 259 (2009). Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## I. October 5 Search and Qualified Immunity

Officer Ford contends that he is shielded by qualified immunity for the warrantless search conducted on October 5, 2005. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Herrera v. City of Albuquerque, 589 F.3d 1064, 1070 (10th Cir. 2009) (quoting Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (further quotation omitted)). As we explained further:

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

Id. (internal quotations omitted).

We employ a two-pronged analysis to resolve a dispositive motion based on qualified immunity. "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Pearson, 129 S. Ct. at 815-16 (internal citations omitted). "Second, . . . the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Id. at 816. "With regard to this second [question], the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful

-8-

under the circumstances presented." Fogarty v. Gallegos, 523 F.3d 1147, 1155 (10th Cir. 2008) (internal quotations and brackets omitted). We may resolve a question of qualified immunity on either ground "in light of the circumstances in the particular case at hand." Pearson, 129 S. Ct. at 818. We review de novo the district court's qualified immunity decision. Weigel v. Broad, 544 F.3d 1143, 1150 (10th Cir. 2008); see also Herrera, 589 F.3d at 1070. Accordingly, we begin our qualified immunity analysis by determining whether there was any clearly established constitutional right that was violated by Officer Ford's entry into Mr. Harris's home on October 5, 2005, during which he seized certain items.

It is undisputed that Officer Ford did not have a warrant when he searched Mr. Harris's home and seized items on October 5. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." United States v. Porter, No. 07-4158, 2010 WL 437337, at *2 (10th Cir. Feb. 9, 2010) (quoting Brigham City v. Stuart, 547 U.S. 398 (2006)). There are a few exceptions to the warrant requirement, however, one of which is "when the exigencies [in a situation] . . . make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Id. (internal quotation omitted). "This exception must be strictly circumscribed by the exigencies." Porter, 2010 WL 437337, at *2 (internal quotation omitted). Further, the "government bears the burden of proving the exigency exception to the warrant requirement applies,"

United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006), which burden "is especially heavy when the exception must justify the warrantless entry of a home." Id.

After the Supreme Court's decision in Brigham City, we apply a two-fold test to determine whether the government has proven that exigent circumstances justify the warrantless entry of a home. We inquire "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." Id. at 718. "We evaluate whether the officers were confronted with reasonable grounds to believe there was an immediate need 'guided by the realities of the situation presented by the record' from the viewpoint of 'prudent, cautious, and trained officers.'" Id. at 718-19 (quoting United States v. Anderson, 154 F.3d 1225, 1233 (10th Cir. 1998)). "The existence of exigent circumstances is a mixed question of law and fact." Najar, 451 F.3d at 717 (internal quotation omitted).

Here, the district court found that exigent circumstances existed: "the court finds that the facts demonstrate that Ford reasonably believed that an individual may have been injured inside of the home. Ford's initial brief entry and search of the residence was reasonable and did not itself violate the Constitution." Memorandum & Order at 12; R. Vol. 3 at 247. We agree with the district court.

Given the situation, it is clear that Officer Ford's initial entry into Mr. Harris's house was justified by the circumstances facing him—the report that the resident had sustained a serious injury, blood on the front porch and door, along with the information that a spent shell casing was involved. Mr. Harris does not seriously argue that the officer's initial entry was unlawful.[5] We accordingly agree with the district court's conclusion that Mr. Harris's rights were not violated by that conduct.

The next inquiry is whether it was unconstitutional for Officer Ford to briefly exit Mr. Harris's home to retrieve his camera and then re-enter it to take photographs and seize items  rather than, at that point, seeking a warrant or seeking consent from Mr. Harris. The defendants argue that the "plain view" exception to the warrant requirement makes Officer Ford's seizure of items on October 5 lawful. "The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." Harman v. Pollock, 586 F.3d 1254, 1264 (10th Cir. 2009) (further quotation omitted). We apply a three-part test which the government must satisfy to justify application of the plain view

_____

[5]In his prior civil action Mr. Harris brought against the Scott County Sheriff's office, Mr. Harris "concede[d] that the Sheriff's Office had a moral obligation to see if anyone else was in danger within the home." Petition at 1; R. Vol. 1 at 70.

exception: "(1) the officer [must be] lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character [must be] immediately apparent— i.e.[,] the officer ha[s] probable cause to believe the object was contraband or evidence of a crime; and (3) the officer [must have] a lawful right of access to the object itself." Id. (further quotation omitted).

Mr. Harris argues that Officer Ford's conduct violated the first and second elements of the plain view test, since he argues (1) the officer was not lawfully in the home or, if he was lawfully in the home to briefly check for other injured people, Officer Ford went far beyond the scope of what was permissible; and (2) Officer Ford did not know that the items observed were contraband because he had not yet learned that Mr. Harris was a felon. We reject these arguments. We have already held that Officer Ford was lawfully in Mr. Harris's home, on the legitimate quest to see if any other persons were injured and needed assistance. And his observation of the items seized in plain view near more blood stains was clearly within the scope of his search. As to whether the officer knew that the items observed were contraband, we remind Mr. Harris that this rule does not require an officer to "know or have an unduly high degree of certainty as to the incriminatory character of the evidence under the plain view doctrine. All that is required is a practical, nontechnical probability that incriminating evidence is involved." United States v. Castorena-Jaime, 285 F.3d 916, 924 (10th Cir. 2002) (further quotations omitted). In this case, when Officer Ford entered Mr. Harris's

home and saw the items ultimately seized, he knew that there had been an explosion that had seriously injured a person and left pools of blood both inside and outside Mr. Harris's home. In plain view near the blood were shotgun shells, .22 caliber shells, ladyfinger firecrackers with no fuses, pipes, a homemade gun, a clock, wristwatches and small hand tools. Collectively these items could very well have appeared to a reasonable and well-trained officer like Officer Ford to be the makings of a bomb or some other explosive device. Thus, he could reasonably have deduced that the items were involved in the criminal activity leading to Mr. Harris's injury. Since there is no dispute as to the third part of the plain view test, we conclude that Officer Ford lawfully seized the items found in Mr. Harris's home in plain view.

Mr. Harris next argues that the district court "erred in failing to find that Ford violated the Fourth Amendment by entering Harris's home without justification and also by re-entering the home for the sole purpose of gathering evidence." Appellant's Op. Br. at 18. The district court characterized this issue as "whether Ford's re-entry negated his ability to seize the items under the plain view doctrine. . . . [i]t appears that this discrete factual scenario has not been addressed by the Tenth Circuit, or the Supreme Court." Memorandum & Order at 14; R. Vol. 3 at 249. The court then went on to apply the second part of the qualified immunity analysis—whether Officer Ford violated any right that was clearly established at the time of the incidents in question. "For a right to be

clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Weise v. Casper, 593 F.3d 1163, 1167 (10th Cir. 2010) (internal alterations and quotations omitted). "The qualified immunity doctrine does not require a case exactly on point. Clearly established does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (internal quotations omitted).

It is telling that Mr. Harris cites no case in support of his claim that Officer Ford violated a clearly established right when he exited and re-entered Mr. Harris's home to photograph items and seize them.[6] No other party cites a case on point. We can find no such case either. Accordingly, we hold that there was no clearly established right which Officer Ford violated in the conduct of the search of Mr. Harris's home on October 5. We turn now to the search on October 6.

---

[6]Indeed, Mr. Harris devotes only a page to this argument, and he simply argues that the right to be free from warrantless searches is clearly established. That does not satisfy the particularity requirement inherent in the qualified immunity inquiry.

## II.  October 6 Search and Consent

"Whether a defendant's consent to search . . . was voluntary is a question of fact, and the court considers the totality of the circumstances in making this determination."  United States v. Carbajal-Iriarte, 586 F.3d 795, 799 (10th Cir. 2009).  Furthermore, "[t]he government bears the burden of proof on this issue, and 'must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.'"  Id.  (quoting United States v. Soto, 988 F.2d 1548,  1557 (10th Cir. 1993)).

Mr. Harris argues that the district court "erred in failing to find that the defendants' October 6 search violated the Fourth Amendment because it was tainted by evidence acquired in the illegal search and because consent was not voluntarily given."  Appellant's Op. Br. at 19.  Mr. Harris argues he was "not in a mental state in which he was able to voluntarily give his consent."  Id.  He presents no support for this conclusory allegation, other than to assert that he must have been on powerful pain medication because of his injured hand, and he asks us to infer that he therefore lacked the ability to make a conscious and voluntary decision.  There is no objective evidence to support this claim, other than conjecture.  We therefore affirm the district court's determination that Mr. Harris gave a valid consent to the October 6 search of his residence.

Mr. Harris also argues "[t]here is a genuine issue of material fact about whether the evidence that served as the basis for Plaintiff's federal prosecution was seized on the 5th or the 6th, which precludes summary judgment and defeats the purported consent exception to the warrant requirement." Id. at 20. In particular, Mr. Harris argues there is inconsistency between the reports of Officer Ford and Agent Tierney as to whether all of the relevant ammunition (.22 caliber ammunition and shotgun shells) was seized on October 5 or October 6 or some was seized on each day.[7] Because we have found nothing unlawful in the warrantless search and seizure on the 5th or in the consensual search on the 6th, this alleged inconsistency is irrelevant.

In sum, we perceive no violation of Mr. Harris's constitutional rights as a result of the search and seizure of items from his house on October 5 and 6, 2005. We accordingly affirm the district court's grant of summary judgment to the defendants.

---

[7]Officer Ford's report recorded no .22 caliber shells seized on the 5th. He testified that he must have "overlooked them," and they were seized the next day. Ford Dep. at p. 107; R. Vol. 3 at 144. Similarly, shotgun shells were reported to have been seized on both days.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the decision of the district court.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge